UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------x

ROBIN SCOTT TELLIER,

                    Petitioner,                    OPINION

        -against-                          97 Civ. 7897 (MGC)

UNITED STATES OF AMERICA

                    Respondent.
--------------------------------X

CEDARBAUM, J.

Robin Scott Tellier petitions to vacate his conviction pursuant to 28 U.S.C. § 2255. The grounds for the petition are that (1) he was denied effective assistance of counsel; (2) he was denied a fair trial as a result of prosecutorial misconduct; and (3) his conviction for violation of 18 U.S.C. § 1951(a), based on the robbery of a private home in Wayne, N.J., was not supported by proof that the robbery had a substantial effect on interstate commerce. Petitioner also requests leave to conduct discovery and requests an order allowing him to possess trial transcripts in order to research his claims based on Crawford v. Washington, 541 U.S. 36 (2004). For the reasons discussed below, petitioner's request to conduct discovery, request to possess transcripts, and motion to vacate his conviction are denied.

1

On March 3, 1994, a jury found petitioner, the leader of a racketeering enterprise dubbed the "Tellier Organization," guilty of participating in a racketeering enterprise, conspiracy to participate in a racketeering enterprise, using and carrying a firearm during and in relation to a crime of violence, robbery conspiracy, possession of a firearm as a convicted felon, interstate transportation of stolen property, and conspiracy to transport stolen goods interstate. Petitioner was sentenced on November 29, 1994 to life imprisonment, to four consecutive terms of imprisonment of twenty years, and to concurrent terms of imprisonment of twenty years, ten years and five years. Petitioner, represented by the same counsel for both trial and direct appeal, appealed his conviction on several grounds, including that the government failed to disclose exculpatory evidence to the defense. On May 10, 1996, the Second Circuit issued a summary order affirming petitioner's conviction. United States v. Tellier, Nos. 94 Cr. 1647, 94 Cr. 1687, 95 Cr. 1014, 94 Cr. 1451 (2d Cir. 1996). On October 21, 1996, the United States Supreme Court denied his petition for a writ of certiorari. Tellier v. United States, 519 U.S. 955 (1996). Petitioner filed his initial § 2255 petition on October 21, 1997. Petitioner

then filed two supplements to the original petition on April 13, 2000 and April 20, 2000. Petitioner also filed a motion to amend his petition on June 5, 2002 and a Fed. R. Civ. P. 60(b) motion for relief from judgment on March 7, 2005, attacking his conviction on the basis of the Supreme Court's decision in Crawford v. Washington, 541 U.S. 36 (2004).

DISCUSSION

I.Timeliness of Claims

Petitioner was required to file his petition under 28 U.S.C. § 2255 within the time limit provided by the statute. Section 2255 provides, in relevant part, that:

> A 1-year period of limitation shall apply to a motion under this section. The limitation period shall run from the latest of--
>
> (1) the date on which the judgment of conviction becomes final;
> (2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;
> (3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
> (4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

Petitioner's original petition was timely filed within one year of the date that his conviction became final. The subsequent supplements and amendments to this petition,

however, were made more than three years after petitioner's conviction became final.  Petitioner argues that these amendments are timely because they relate back to the filing date of the original petition under Fed. R. Civ. P. 15(c).

Rule 15(c) provides that an amended pleading relates back to the date of the original pleading when "the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading."  The Supreme Court recently held that amendments to a Section 2255 petition will only relate back to the original petition under Rule 15(c) if the new claims and the claims asserted in the original petition "are tied to a common core of operative facts."  Mayle v. Felix, 125 S. Ct. 2562, 2574 (2005).  New claims in the amended petition that merely arise out of the same "trial, conviction, or sentence" as the claims in the original petition do not relate back to the original petition filing date under Rule 15(c).  Id. The Court reasoned that "[i]f claims asserted after the one-year period could be revived simply because they relate to the same trial, conviction, or sentence as a timely filed claim, [the statute's] limitation period would have slim significance."  Id. at 2573-74.

All of petitioner's supplemental and amended claims complaining of the conduct of his counsel during the course of the trial are untimely. These claims do not arise out of any conduct, transaction, or occurrence that was set forth or attempted to be set forth in petitioner's original petition and therefore do not relate back to the filing date of the original petition. As newly asserted claims filed after October 1997, these claims are not timely under any of the various one-year limitation periods enumerated in 28 U.S.C. § 2255(1)-(4).

Petitioner argues that equitable tolling of the one-year statutory time limit should apply to allow consideration of these claims. However, equitable tolling "applies only in the rare and exceptional circumstance." Smith v. McGinnis, 208 F.3d 13, 17 (2d Cir. 2000)(holding that petitioner did not present extraordinary or exceptional circumstances warranting equitable tolling)(internal quotations omitted). Petitioner has alleged no facts that would justify an equitable tolling of the statute of limitations in this case.

Petitioner's untimely claims are: (1) that counsel failed to challenge the improper grand jury indictment procedure in this case; (2) that counsel failed to request production of two bullets from the Seychel homicide or find

out why they were not turned over; (3) that counsel failed to question the defense ballistics expert about the shooting incidents involving the murder of Kevin Hogan or the Sterns robbery; (4) that counsel failed to call two police experts who would have contradicted the government expert's testimony matching the bullets from the Panuccio and Seychel shootings; (5) that counsel failed to request that the defense ballistics expert perform several calculations; (6) that counsel failed to move to "suppress" numerous witnesses who cooperated with the government; (7) that counsel failed to request that the court allow petitioner more time to speak at his sentencing and failed to speak on petitioner's behalf; (8) that counsel failed to request a continuance to allow more time to investigate information obtained from police reports; (9) that counsel agreed to the admission of petitioner's uncharged crimes in order to benefit petitioner's co-defendants; (10) that counsel, along with counsel for Rene Tellier, allegedly violated the attorney-client privilege by informing the trial judge that Rene Tellier intended to testify falsely; (11) that counsel allocated investigation services to codefendants rather than to petitioner; (12) that counsel allowed Rene Tellier's counsel to write part of the appellate brief and a motion, against petitioner's wishes; (13) that counsel failed to

object to the admission of a taped conversation between petitioner and government witness Charles Schrader; (14) that counsel failed to request a severance from petitioner's codefendant, whose taped confession was admitted at trial; (15) that counsel failed to object to improper closing argument by the prosecutor; and (16) that counsel failed to object to prosecutor's mischaracterization of defense expert's testimony. All of these claims are untimely.

Petitioner's claim for relief under the Supreme Court's decision in Crawford v. Washington, 541 U.S. 36 (2004) also does not provide a basis for the relief he seeks. Although this claim was filed within one year from the date of the Crawford decision, the Second Circuit has explicitly held that Crawford is not retroactively applicable. Mungo v. Duncan, 393 F.3d 327, 336 (2d Cir. 2004). In light of this decision, there is no basis to grant petitioner's request for an order allowing him to possess trial transcripts to research his Crawford claim.


II. Ineffective Assistance of Counsel

Petitioner argues that his counsel provided ineffective assistance by (1) failing to investigate alternate suspects and alibi witnesses in the homicides of Phillip Panuccio, John Seychel and Tina Smith; (2) failing

to utilize the court appointed investigator effectively; and (3) failing to investigate eyewitness accounts contained in police reports that offer conflicting or contradictory descriptions of the suspects in several robberies.

In order to prevail on an ineffective assistance of counsel claim, the petitioner must "(1) show that counsel's conduct fell below 'an objective standard of reasonableness' under 'prevailing professional norms,' and (2) 'affirmatively prove prejudice.'" United States v. Kirsh, 54 F.3d 1062, 1071 (2d Cir. 1995)(quoting Strickland v. Washington, 466 U.S. 668, 688, 693 (1984)). There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689. Furthermore, "[a]ctions or omissions by counsel that might be considered sound trial strategy do not constitute ineffective assistance." Mason v. Scully, 16 F.3d 38, 42 (2d Cir. 1994)(quoting Strickland, 466 U.S. at 689). To show prejudice, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694.

Petitioner fails to show that he was prejudiced by any of counsel's alleged errors.

## A. Failure to Investigate Alternate Suspects and Alibi Witnesses in Homicides

### 1. Phillip Panuccio Homicide

Petitioner argues that counsel fell below an objective standard of reasonableness by failing to investigate the possibility that William Gabler, Bruce Rubino, Sandra Sucato, or the father of Kim Bilbrey's friend Pam killed Phillip Panuccio. Petitioner also argues that trial counsel failed to conduct adequate investigations of witnesses who could have provided petitioner with an alibi for the time of the Panuccio murder. Petitioner asserts that he told counsel that Frank Rizzo, Earl Gallo, and Candice Ku could have attested to petitioner's presence at the Green Parrot nightclub until the club's closing at four in the morning on the night of the murder.

However, even if counsel's performance were found to be unreasonable, petitioner cannot prove prejudice. The Panuccio homicide was just one of over a dozen predicate acts set forth in the racketeering charge in the indictment. The errors alleged by petitioner in this claim and elsewhere in his motion to vacate his conviction do not affect the jury's findings that petitioner committed the two predicate

acts of robbery near a Pearle Express store in Yonkers and
interstate transport of furs stolen from John Pappas Furs.
Therefore, even if counsel's alleged ineffective assistance
might have altered the jury's finding that petitioner
committed the Panuccio homicide, this finding would not have
altered the verdict against petitioner on the racketeering
charges.

### 2.John Seychel Homicide

Petitioner argues that counsel fell below an objective
standard of reasonableness in his investigation of the John
Seychel murder and that counsel failed to follow leads that
demonstrated that petitioner had no links to the Seychel
murder, which was allegedly committed by Rene Tellier.
However, petitioner was not charged with the murder of
Seychel, nor did the government allege in the RICO
indictment that petitioner had any involvement in this
crime.  Petitioner therefore cannot show prejudice resulting
from the acts of his counsel related to this crime.

### 3.Tina Smith Homicide

Petitioner claims that counsel failed to follow leads
that could have led to exculpatory witnesses in the Smith
murder, which was allegedly committed by Rene Tellier.
However, petitioner was not charged with the murder of Tina
Smith, nor did the government allege in the RICO indictment

that petitioner had any involvement in this crime.
Petitioner therefore cannot show prejudice resulting from
the acts of his counsel related to this crime.

### A. Failure to Utilize Investigator
### to Investigate Homicides Charged

Petitioner argues that counsel's failure to utilize the
court-appointed investigator effectively resulted in a
failure to investigate the homicides charged and to uncover
potentially exculpatory witnesses.  Petitioner contends that
the investigator was called upon to investigate on his
behalf very minimally and only during the end of the trial.
Petitioner also asserts that during the course of the trial,
the investigator was instructed to abandon certain
investigations for petitioner in order to pursue other
matters.  Petitioner contends that counsel failed to utilize
the private investigator's services adequately, which
rendered him unprepared to confront many of the government's
witnesses with exculpatory evidence or to present
alternative theories to the jury concerning the several
homicide allegations.  Petitioner also argues that counsel's
cross-examination was inadequate as a result of his
insufficient investigation and that he was prejudiced by
counsel's failure to challenge the testimony of the
government's witnesses.  However, with the exception of

statements by witness Richard Conroy regarding the Panuccio homicide, petitioner does not allege what evidence the private investigator might have uncovered to exculpate petitioner or to allow counsel to challenge the testimony of the government's witnesses.  Petitioner has failed to show that counsel's failure to interview Conroy about the Panuccio homicide prejudiced him, see Part I.A.1, supra, and fails to explain how he was otherwise prejudiced by this alleged ineffective assistance.

### B. Failure to Investigate Eyewitness Identifications in Robbery Conspiracies

Petitioner argues that counsel failed to investigate eyewitness accounts available in police reports that offered conflicting or contradictory descriptions of the suspects in several of the robberies with which petitioner was charged. Petitioner argues that counsel failed to investigate or interview these witnesses and failed to attempt to develop favorable or exculpatory evidence for petitioner.

### 1. Jindo Furs

Petitioner asserts that counsel failed to interview an eyewitness to the Jindo Furs robbery, Casimir Mynarski, who identified the robbers as three black males in his initial complaint to the police.  However, counsel did in fact investigate this report and called Mynarski as a defense

12

witness at trial.  Mynarski's trial testimony was not at all
exculpatory.  Mynarski testified that he could only recall
the race of one of the individuals that he saw, and that
individual was a white male.

Petitioner also argues that counsel failed to interview
John Venidis and David Vermeal, both employees of Jindo Furs
and witnesses to the robbery.  Petitioner alleges that both
men would have testified that the robbers had dark skin.
However, there is no evidence that counsel knew of or had
reason to know of the existence of Venidis and Vermeal.  It
cannot be said that by failing to locate witnesses of whose
existence or relevance to the case counsel had no knowledge
that counsel's representation fell below an objective
standard of reasonableness according to prevailing
professional norms.

Petitioner also argues that counsel was ineffective for
failing to follow up on a document subpoenaed during trial
that identified Renzy Holloway as a security guard at
Bloomingdale's who saw three men putting furs into a car
trunk.  Petitioner alleges that, if interviewed, Holloway
would have stated that he knew of another, unidentified
security guard who had witnessed black males committing the
robbery.  However, counsel's failure to interview Holloway,
based on Holloway's brief and possibly inculpatory initial

statement to the police, was not professionally
unreasonable.

### 2.Sterns Department Store

Petitioner alleges that counsel was ineffective for
failing to obtain and thoroughly review police reports
recording the observations of two security guards, Ron Bower
and John Vittoria, who were working at Sterns department
store.  Petitioner argues that one undiscovered police
report shows that security guard Bower stated that the
robbers resembled two former employees.  Another report
indicates that security guard Vittoria mentioned that he had
seen the two former employees on the day of the robbery.
Petitioner argues that if counsel had obtained these police
reports, he could have more effectively cross-examined the
security guards, identifying conflicts between their
statements in court and in the detective reports, as well as
developing the alternate theory that two former Sterns
employees were responsible for the crime.  Petitioner also
contends that if counsel had discovered the reports, he
could have forced Vittoria to admit on cross-examination
that he had been interviewed by police detectives about the
robbery, contrary to Vittoria's testimony at trial that he
was not interviewed by detectives, but rather by uniformed
police officers.  Petitioner argues that counsel could also

have elicited testimony from Bower that Vittoria told him
that he saw two former Sterns employees driving around the
parking lot just before the break-in.

However, petitioner cannot show that he was prejudiced
by counsel's alleged failure to discover these reports and
witnesses. Petitioner previously raised a similar claim in
his direct appeal, arguing that the government had
wrongfully suppressed the police report about the interview
with security guard Bower. United States v. Tellier, Nos.
94 Cr. 1647, 94 Cr. 1687, 95 Cr. 1014, 94 Cr. 1451, at 11
(2d Cir. 1996)(unpublished summary order). The Second
Circuit held that there was "absolutely no chance" that the
availability of this information about the Bower interview
would have altered the jury's verdict on the RICO or RICO
conspiracy counts.

Regarding security guard Vittoria, the police report
shows that Vittoria was not in fact a witness to the robbery
and that he simply saw former employees arrive at work on
the day of the robbery. According to petitioner's wife's
affidavit, Vittoria himself "could not remember if he had,
in fact, seen [the two former Stern's employees] right
before the robbery." Thus, the police report would have
provided counsel with little basis either to discredit
Vittoria or to develop an alternate theory of the crime.

Furthermore, there is no reasonable probability that an admission by Victoria on cross-examination that he had been interviewed by detectives about the robbery would have altered the jury verdict. Vittoria clearly stated at trial that he was interviewed by police officers.

Finally, petitioner argues that counsel was ineffective for failing to locate or interview another witness to the Sterns robbery, Abraham Kleinman, who attests that he told the police and an Assistant United States Attorney that he observed a black male at the scene of the crime.[1] As to Kleinman, petitioner does not allege that counsel was aware of the existence of this witness or present any evidence to show that counsel was or should have been aware of his existence. Petitioner submits only an affidavit from Kleinman in which Kleinman describes his observations at the crime scene. This affidavit, dated September 10, 1997, was clearly not available to counsel at the time of trial. Once again, it cannot be said that by failing to locate a witness of whose existence or relevance counsel had no reason to know, that counsel's representation fell below an objective

---

[1] The Second Circuit stated in its review of petitioner's claim on appeal that the government suppressed exculpatory statements by Kleinman: "We find no statement identifying the perpetrators' race in the police report of the initial Kleinman interview, nor do we find such a statement in the affirmation of Assistant United States Attorney Reisner, who subsequently interviewed Kleinman." United States v. Tellier, Nos. 94 Cr. 1647, 94 Cr. 1687, 95 Cr. 1014, 94 Cr. 1451, at 11 (2d Cir. 1996)(summary order). Petitioner does not allege whether or not these reports were turned over to the defense.

standard of reasonableness according to prevailing
professional norms.

### 3. Antonovich Furs – Manhattan[2]

Petitioner argues that counsel was ineffective for
failing to find and interview Anthony Brown, a witness to
the Antonovich Furs store robbery.  Brown was interviewed by
a police officer in a follow up report, in which Brown
identified the perpetrators of the robbery as four black
males.  Petitioner also argues that counsel was ineffective
for failing to discover a police report in which an
unidentified security officer discusses the involvement of a
red-haired male in the robbery.

However, petitioner was not charged with the robbery of
the Antonovich Furs store in Manhattan, nor did the
government allege in the RICO indictment that petitioner had
any involvement in this crime. Petitioner therefore cannot
show prejudice resulting from the acts of his counsel
related to this crime.

### 4. Tourneau Jewelers

Petitioner argues that counsel was ineffective for
failing to follow up on a police report in which Walter
Queren, an employee of Tourneau Jewelers, stated that he had

---

[2] This undiscovered evidence is erroneously referred to in the petition
as relating to the "Antonovich Furs – Brooklyn" robbery.  The evidence
petitioner references relates only to the robbery of the Antonovich Furs
store in Manhattan.

learned through a friend that the Tourneau nighttime security guard saw four black males in a black Monte Carlo parked outside the jewelers on the morning of the robbery. Petitioner also argues that counsel was ineffective for failing to locate a police report that indicated that background checks were performed on the security officers. Petitioner argues that this report shows that the guards might have been suspects in the crime.

However, petitioner again fails to show that he was prejudiced by counsel's alleged errors. First, Queren's statements are hearsay removed by many individuals from the original source. Moreover, when the police investigator followed up on this information, the original source indicated that he could not see or identify the individuals in the car because the windows were tinted. There is no reasonable probability that the verdict would have been different if counsel had investigated the information in these reports. As the Second Circuit stated, addressing petitioner's claim on direct appeal, "the multiple hearsay statement was preliminary information...and the later report rendered the first immaterial." United States v. Tellier, Nos. 94 Cr. 1647, 94 Cr. 1687, 95 Cr. 1014, 94 Cr. 1451, at 12 (2d Cir. 1996)(summary order). The information about the background checks on the security guards is similarly not

material, as the background checks were a routine matter, executed because the guards were present at the scene of the crime, and the background checks both yielded negative results.

### 5.Ditmars Blvd. UPS

Petitioner argues that counsel was ineffective because he did not find and interview John Sevalla, an alleged witness to the Ditmars Blvd. robbery. Petitioner asserts that he is actually innocent of this crime and that if counsel had found and interviewed Sevalla, Sevalla could have discredited government witness Orlando Rodriguez, who identified petitioner as a participant in this crime. Petitioner contends that Sevalla could have identified Rodriguez as a participant in the crime and testified that he saw no indication that Rodriguez had an ear piece or carried a radio at the crime scene, thereby discrediting Rodriguez's testimony that he was in radio contact with petitioner during the robbery.

However, there is no evidence that counsel was aware of or should have been aware of the existence of Sevalla as a witness to the Ditmars robbery. Moreover, petitioner cannot show that he was prejudiced by counsel's failure to locate, interview and call Sevalla as a witness. The testimony of one witness that he did not observe Rodriguez wearing an

earpiece does not negate Rodriguez's testimony that he did wear an earpiece, nor discredit Rodriguez's testimony as to the key matter of petitioner's participation in the crime.

Petitioner also argues in his supplemental petition, filed more than a year after his conviction became final, that counsel was ineffective for failing to uncover the arrest record of Orlando Rodriguez, which reveals that Rodriguez pushed and shoved an officer while avoiding arrest.  Petitioner argues that this incident was more serious than Rodriguez indicated at trial.  Petitioner also argues that counsel failed to obtain the parole records of Rodriguez, which include details on his past crimes. Counsel also failed to get Rodriguez's criminal case file, which allegedly reveals that Rodriguez "never mentioned petitioner's involvement in the crime" when he first began to cooperate with the police.

However, even if petitioner's claim were timely presented under 28 U.S.C. § 2255, petitioner cannot show that he was prejudiced by counsel's alleged errors. Rodriguez was questioned extensively at trial concerning his prior crimes, which include narcotics trafficking, assault, assault of a police officer, theft, burglary, interstate transportation of stolen property, conspiracy to commit

armed robbery, and arson to cover up armed robbery.
Rodriguez's criminal disposition, past lies and motive to
inculpate petitioner were fully disclosed to the jury.
Evidence of Rodriguez's participation in additional, similar
bad acts would have done little to discredit him further.
Furthermore, Rodriguez's initial failure to inculpate
petitioner does not impeach his trial testimony.  The report
petitioner cites regarding Rodriguez's initial statements to
police does not describe a comprehensive debriefing of
Rodriguez concerning all aspects of the crime and the roles
of all coconspirators involved.  Rodriguez's failure to
inculpate petitioner in these statements does not impeach
his later inculpatory statements.

### 6. Wayne, N.J. Robbery

Petitioner argues that counsel was ineffective because
he failed to contact or interview witnesses who could have
provided evidence that petitioner was not involved in the
robbery of a private home in Wayne, New Jersey.  The
government's theory at trial was that petitioner became
involved in the robbery on the day of the event.  Petitioner
alleges that counsel should have interviewed Gregory
Botsaris and Thomas "Mike" Kelly, both alleged planners of
the robbery.  Botsaris and Kelly attest in affidavits
provided by petitioner that they never saw or met petitioner

prior to petitioner's conviction in this case. Petitioner also argues that counsel was ineffective for failing to interview workers in the restaurant where the robbery was planned and for failing to discover alleged exculpatory witness Eden Ardile, a neighbor of the robbery victims. Finally, petitioner argues that counsel should have followed up on an interview with chief investigator Creegan, in which Creegan stated that he believed that a brown four-door Buick sedan was one of the cars used in the robbery. Petitioner argues that this would have shown that petitioner's car, a brown Bonneville, was not used in the robbery.

However, petitioner does not explain how counsel knew or should have known of the existence of Botsaris, Kelly or Ardile. Furthermore, neither Botsaris nor Kelly claim to have been present at the robbery, while the government's witness Paulo Petrakos testified at trial that he was present and participated in every aspect of the crime. Therefore, the testimony of Botsaris and Kelly would not have discredited the eyewitness testimony provided by Petrakos, and their testimony is entirely consistent with the government's theory that petitioner did not become involved in the robbery until the day of the event. Furthermore, counsel's failure to investigate the workers at the restaurant where the crime was planned was not

unreasonable.  Testimony by restaurant employees that the alleged planners of the robbery had foreign-sounding accents would not have exculpated petitioner because it was not alleged that petitioner became involved in this robbery until the day of the robbery.  Likewise, testimony by Ardile that the particular man she ran into at the Wayne, N.J. house on the day that of the robbery had a foreign accent is not evidence that petitioner did not participate in the robbery.  Finally, the statements by chief investigator Creegan that petitioner cites, describing one of the cars used in the robbery, would have been inadmissible at trial. Creegan merely says that other people told him that the robbers "went up [to the Wayne, N.J. house] with BMW and Karpathios car."  There is no indication that Creegan had any personal knowledge of which cars were used in the robbery and any statements by him as to what others told him are inadmissible hearsay.

### 7. Consumer Distributors

Petitioner argues that counsel was ineffective for failing to investigate a police report detailing an eyewitness's statement that three black males wearing ski masks were seen leaving the scene of the Consumer Distributors robbery in a black Monte Carlo.  However, even if counsel's performance were found to be unreasonable,

petitioner cannot prove prejudice.  Like the Panuccio homicide, the Consumer Distributors robbery was just one of over a dozen predicate acts set forth in the racketeering charge in the indictment.  The errors alleged by petitioner in this claim and elsewhere in his motion to vacate his conviction do not affect the jury's findings that petitioner committed the two predicate acts of robbery near a Pearle Express store in Yonkers and interstate transport of furs stolen from John Pappas Furs.  Therefore, even if counsel's alleged ineffective assistance might have altered the jury's finding that petitioner committed the Consumers Distributors robbery, this finding would not have altered the verdict against petitioner on the racketeering charges.

### 8. Model Imperial Perfume

Petitioner argues that counsel was ineffective for failing to uncover a police report that, petitioner argues, shows that there were other suspects in the Model Imperial Perfume robbery.  The report identifies three individuals who were detained in Brooklyn on the morning after the Model Imperial robbery.  Petitioner also contends that counsel was ineffective for failing to locate and unseal the criminal case file of Jorge Reyes, one of the individuals identified in the police report.  Petitioner argues that Reyes' incomplete criminal file shows that Reyes was charged with

possession of a weapon, stolen property and grand larceny. However, the undiscovered report that petitioner references is the second page of a two page document that does not present any evidence linking the three detained individuals to the robbery, except for the fact that they were arrested on the same morning that the crime occurred. Counsel's failure to discover this report or to investigate it was therefore not objectively unreasonable.

### A. Failure to Investigate and Discover Information Contained in Public Records

Petitioner generally argues that counsel failed to investigate and discover information contained in public police records. Petitioner asserts that this amounts to a failure to investigate, and that petitioner was prejudiced by counsel's failures. However, petitioner does not cite any specific circumstance or documents that counsel failed to discover and accordingly does not explain how this failure resulted in prejudice to him.

### B. Cumulative Effect of Counsel's Error

Petitioner asserts that the cumulative effect of counsel's errors deprived petitioner of the effective assistance of counsel. Petitioner asserts that counsel failed to perform his own investigations, failed to use the court-appointed investigator, and failed to follow up on

leads presented in the police reports, letters, and statements at trial provided by the government. Petitioner further alleges that counsel failed to cross-examine several key witnesses in this case, including all of the witnesses related to the Hogan homicide. Petitioner argues that he was prejudiced by the cumulative effect of counsel's failures, and that because of these errors, the government's case was left unchallenged.

However, petitioner does not allege what helpful information counsel could have elicited from these unidentified "key witnesses" regarding the Hogan homicide, nor how he was prejudiced by counsel's failure to cross-examine "several key witnesses" at trial. Counsel's decisions at trial are viewed with "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689. The "defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Id. Petitioner has failed to show that counsel's decision not to cross-examine some unspecified trial witnesses was not part of a sound trial strategy. As each of petitioner's individual claims of ineffective assistance lacks merit and the cumulative effect

of counsel's alleged errors did not result in prejudice to petitioner, this cumulative claim fails as well.

## I. Government Misconduct

Petitioner argues that there was egregious and pervasive government misconduct in this case that violated his constitutional due process rights. Prosecutorial misconduct does not amount to a denial of the right to a fair trial unless petitioner shows a "reasonable probability" that the result of the proceeding would have been different in the absence of the alleged misconduct. United States v. Bagley, 473 U.S. 667, 682 (1985). Furthermore, petitioner cannot relitigate issues in a Section 2255 motion that he raised and addressed on direct appeal. Riascos-Prado v. United States, 66 F.3d 30, 33 (2d Cir. 1995). Moreover, if a defendant fails to raise a misconduct claim on direct appeal, he is then barred from advancing it in a subsequent Section 2255 petition unless "he can show cause for his procedural default and actual prejudice resulting from the error," or state a claim of "actual innocence." Id. at 34; Rosario v. United States, 164 F.3d 729, 732 (2d Cir. 1998).

## A. Threatening Ms. Fu

Petitioner argues that the government threatened to arrest petitioner's girlfriend, Yanina Fu, if she testified

on petitioner's behalf at the suppression hearing.
Petitioner contends that Fu was a material witness whose
testimony would have shown that she did not live in the
apartment, but maintained her own residence in Port Chester,
N.Y. Petitioner does not allege that Fu would have
testified that she told the officers who conducted the
search that she did not reside in the apartment.
Furthermore, Fu would have rebutted the government's
contention that Fu asked the police not to tell petitioner
that she gave permission for the search. Fu would have also
rebutted the government's allegation that Fu was going to
have an abortion on the day of the search. The abortion
allegation, petitioner argues, was damaging to him because
it suggested that Fu did not wish to carry petitioner's
child.

This claim is barred by petitioner's failure to show
cause for his failure to raise this issue on direct appeal.
Petitioner admits that he was aware of the alleged
misconduct prior to the suppression hearing, yet he has not
shown cause for failing to raise this issue on direct
appeal. Furthermore, petitioner fails to show how he was
prejudiced by the alleged misconduct. Even if Fu had
testified, her testimony that she was a visitor in the
apartment and not a resident would not have affected the

determination that the police made a reasonable determination at the time of the search, based on the facts available to them at that time, that Fu had authority over the premises. On appeal, the Second Circuit affirmed the determination that "the police officers reasonably believed that Fu had authority to consent." <u>United States v. Tellier</u>, Nos. 94 Cr. 1647, 94 Cr. 1687, 95 Cr. 1014, 94 Cr. 1451, at 9 (2d Cir. 1996) (summary order).

### B. Pressuring Witnesses

Petitioner next alleges that the government told Thomas Hawco, a witness to the robbery of the Antonovich Furs store in Brooklyn, to change his testimony to say that the men he observed rob the store were "olive-skinned," not Hispanic. However, petitioner was not charged with the Antonovich Furs robbery in Brooklyn, nor did the government allege in the RICO counts in the indictment that petitioner had any involvement in this crime. Petitioner therefore cannot show prejudice resulting from any alleged misconduct related to Hawco's testimony.

Petitioner also alleges that the government pressured Dominick DeVito not to testify that he saw William D'Angelo kill Tina Smith. The government allegedly threatened to indict DeVito if he testified that D'Angelo was the killer. This allegation is supported by affidavits from DeVito and

DeVito's brother, Nick DeVito.  However, petitioner was not charged with the Tina Smith murder, nor did the government allege in the RICO counts in the indictment that petitioner had any involvement in this crime. Petitioner therefore cannot show that he was prejudiced by the alleged misconduct.


## C. Use of Perjured Testimony

Petitioner argues that the government knowingly used the perjured testimony of Charles Schrader, Basil Reece, and John Vittoria at trial.  Petitioner did not raise these claims on direct appeal and does not show any cause for this procedural default.  See Riascos-Prado v. United States, 66 F.3d 30, 33 (2d Cir. 1995).  However, even if petitioner could show cause for his failure to assert these claims on appeal, petitioner nonetheless fails to show that he was prejudiced by the use of the allegedly perjured testimony.

Petitioner alleges that at trial Schrader misstated the offense for which he had a prior conviction.  Schrader stated that he was convicted of criminal mischief for getting into a fight with a friend, but petitioner contends that Schrader was actually convicted of filing a false police report claiming that three men robbed Schrader's

workplace, when Schrader himself committed the robbery.
Petitioner alleges that the government was aware of
Schrader's conviction and should have brought the false
testimony to the attention of the court.

First, there is no evidence to support petitioner's
claim that Schrader himself committed the workplace robbery.
However, more importantly, petitioner cannot show any
reasonable probability that the result of the proceeding
would have been different absent the allegedly false
testimony.  At trial, Schrader admitted to an extensive
criminal history, including robbery, possession of stolen
property, burglary, larceny, grand larceny, reckless
endangerment, assault, bail jumping, marijuana use, cocaine
use, free-base cocaine use, avoiding arrest and serving a
year in jail.  Schrader also admitted to lying to various
authorities in the past, including perjury to a grand jury.
The additional evidence petitioner cites would have done
little to diminish Schrader's credibility further in the
eyes of the jury.

Petitioner also argues the government improperly
allowed Basil Reece to provide a false description of the
two Model Imperial Perfume robbers in his testimony at
trial.  Reece had not given a very detailed description of
the perpetrators in his 911 call, but Reece was able to

describe the robbers at trial.  Petitioner argues that the government was aware of Reece's statements in the 911 call, and that the government should have brought the "false" trial testimony to the attention of the court.

Petitioner's allegations do not support the claim that Reece committed perjury.  Reece did provide some information describing the perpetrators in his 911 call, but did not provide a lengthy description.  The call was made while the robbery was in progress, and Reece was hiding in the bathroom after being shot.  Reece's trial testimony was not inconsistent with his prior statements.

Finally, petitioner argues that the government allowed John Vittoria, a Sterns department store security guard, to testify falsely that he was never questioned by police detectives.  Petitioner alleges that police reports in the possession of the government show that Vittoria was interviewed by police detectives and that Vittoria went to the 109th precinct to view photographs in the detective squad room.  Petitioner argues that the government should have brought this "false" testimony to the attention of the court.

However, petitioner cannot show any reasonable likelihood that the result of the proceeding would have been different without Vittoria's allegedly false testimony.

Vittoria clearly stated at trial that he was interviewed by uniformed police officers.  Pointing out Vittoria's minor misstatement as to the rank and title of the police officers who interviewed him would have done little to undermine Vittoria's credibility.  Furthermore, informing the jury that Vittoria was also interviewed by detectives would have done little to alter the jury's understanding of Vittoria's interactions with the police regarding the robbery.

### D. Discovery Violations

#### 1. Claims in Original Petition

In his original motion to vacate his conviction, petitioner claimed that there are additional materials available regarding the Panuccio homicide which the government did not provide in discovery and should have disclosed to the defense.  Petitioner based this assertion on a letter from the Department of Justice responding to Rene Tellier's Freedom of Information Act ("FOIA") request for the Panuccio FBI file.  In the letter, the Department indicates that some additional information is available regarding the Panuccio case that has not been released pursuant to the FOIA request, which could be disclosed if the requester had a case pending before the district court.

However, petitioner has offered no evidence to show that this information was not disclosed at trial and that it

should have been disclosed to the defense.  There is nothing
in the letter that Rene Tellier received from the Department
of Justice to indicate that any of the documents in the FBI
file that were not disclosed through the FOIA request had
not previously been disclosed to petitioner at trial, and
were subject to disclosure.

2.Claims in April 2000 Submission

In a supplement to his original petition filed in April
2000, petitioner adds several new claims that the government
failed to disclose material information to the defense.
Petitioner alleges that the government failed to disclose
impeachment evidence in the parole files of government
witnesses Orlando Rodriguez, Charles Schrader, Paulo
Petrakos, and William D'Angelo.  None of these claims were
raised in petitioner's direct appeal and petitioner does not
show cause for this procedural default.

Furthermore, none of these claims were presented in
petitioner's original, timely-filed § 2255 petition, nor do
they relate back to the filing date of the original petition
under Rule 15(c) because they do not arise out of any of the
same conduct, transactions, or occurrences set forth or
attempted to be set forth in the original pleading.
Therefore, even assuming that petitioner could show cause
for failing to raise these claims on appeal, the new claims

are only timely under 28 U.S.C. § 2255 if they were raised within one year of the date on which "the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence" or within one year from "the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed." 28 U.S.C. § 2255.

Petitioner does not specify the date on which he discovered the facts that support these claims, except to state, without any evidentiary or factual support, that the evidence "was unavailable until recently." Nor does he explain why these facts could not have been discovered earlier through the exercise of due diligence. Nor does petitioner allege that he was impeded from making this motion by illegal government action. The date on which petitioner should have discovered the facts supporting these claims through the exercise of due diligence is a factual question. Wims v. United States, 225 F.3d 186, 190 (2d Cir. 2000). Petitioner has failed to offer any facts to meet his burden to show the timeliness of these claims under Section 2255.

3.Claims in June 2002 Submission

In petitioner's June 5, 2002 submission, petitioner
asserts several additional, new claims that the government
failed to disclose exculpatory information to the defense.
Petitioner asserts that the facts supporting these new
claims were discovered on September 28, 2001, when the FBI
responded to Rene Tellier's FOIA request with 1,511 pages of
documents.  Petitioner does not explain why these documents
could not have been discovered prior to September 28, 2001
through the exercise of due diligence and does not allege
when Rene Tellier's FOIA request was filed.[3]

Courts have found that a petitioner exercised due
diligence by making a FOIA request within one year of the
date that petitioner's conviction became final, see United
States v. Smith, No. 90-296-18, 2000 WL 1268254, at *1 (E.D.
Pa. Aug. 28, 2000); Edmond v. United States Attorney, 959 F.
Supp. 1, 3-4 (D.D.C. 1997).  In contrast, a petitioner's
failure to make a FOIA request within the limitations period
has been found to "suggest[], although it does not
necessarily prove, that there has not been the requisite due
diligence."  Ruiz v. United States, 221 F. Supp. 2d 66,
77 (D. Mass. 2002)(holding that petitioner who waited

---

[3] Petitioner does not state when the FOIA request that resulted in the
release of these documents was filed.  Petitioner's codefendant, Rene
Tellier, does state in a letter to the court dated September 5, 2000
that he filed a FOIA request with the Justice Department prior to the
filing of his initial Section 2255 petition in October, 1997.  It is not
clear if the documents released to Rene Tellier on September 28, 2001
were received pursuant to Rene Tellier's 1997 FOIA request.

approximately eighteen months to file a FOIA request did not exercise due diligence); <u>United States v. Harris</u>, No. 97-34-P-H, 1999 WL 33117115, at *2 (D. Me. Nov. 1, 1999)(finding that petitioner who waited approximately eighteen months to file a FOIA request did not exercise due diligence) (magistrate judge opinion).

First, petitioner himself did not file the FOIA request that is the source of the "newly discovered" evidence presented here, suggesting that he failed to exercise due diligence in discovering this evidence. Second, petitioner does not allege that this request was filed within one year of the date on which petitioner's conviction became final. Finally, petitioner does not allege that the government failed to respond to the FOIA request in a timely manner such as unlawfully to impede the timely filing of these claims. In short, petitioner has failed to allege any facts to support the timeliness of these claims under Section 2255.

However, even if petitioner's claims were timely, petitioner has failed to show that he was prejudiced by the alleged failure to disclose. The Supreme Court has determined that the government's "suppression of evidence amounts to a constitutional violation only if it deprives the defendant of a fair trial." <u>United States v. Bagley</u>,

473 U.S. 667, 678 (1985).  Evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."  Id. at 682.

Petitioner alleges that the government failed to disclose (1) a New York City Medical Examiner's serology lab report on a woman, who petitioner argues is Tina Smith, which states that swabs of the decedent's body tested negative for semen; (2) an FBI lab report that states that the source of hairs found on Tina Smith's clothing could not be identified; (3) a transcript of a call by a woman who identified two black males in a black Monte Carlo as the perpetrators of the Cassandra Designs robbery; (4) a transcript of two 911 calls about the Dyansen Art Gallery robbery, in which one caller identified the robbers as three or four black and white males and a second caller identified the robbers as three black males in a blue Caprice Classic; (5) a complaint follow-up report which states that four of the five robbers wore masks during the Antonovich Furs store robbery in Brooklyn; (6) an FBI memorandum indicating that four of the five Antonovich Furs Brooklyn store robbers wore masks and that they left the scene in a Monte Carlo and

Honda Prelude; (7) a police report about the robbery of the
Antonovich Furs store in Brooklyn which states that two
witnesses saw a beige Chevy van and navy blue Mercury
Marquis pull up to the location and that a white male in his
fifties walked to the door of the store while two others
stood by with empty plastic bags; (8) a transcript of a 911
call in which the female caller stated that the Antonovich
Furs store in Brooklyn was broken into by four males, two
white and two possibly Hispanic, who drove away in a black
Monte Carlo and in which the caller's husband described the
robbers as a white male with "an afro shape" haircut and
another Puerto Rican/Spanish heavyset guy; (9) a police
follow-up report (#28) on the Jindo Furs store robbery in
which a witness stated that he saw two black males who were
not involved in the robbery near the scene, and in which he
stated that all the robbers were wearing masks; (10) a
police follow-up report (#30) on the Jindo Furs store
robbery in which a witness stated that all the males robbing
Jindo Furs were masked and armed; (11) an FBI report about
an interview with the owner of the stolen 1998 Jeep Cherokee
used to commit the Jindo Furs robbery, in which the owner
reported that the jeep was stolen by three white males, one
of whom was balding and in his early fifties; and (12) a
police follow-up report (#8) indicating that a witness saw a

male Hispanic, 5'6", thin with a mustache, who was looking into a fur store, believed to be the "A Certain Image" fur store, on three nights in a row prior to the robbery.

Even if the government should have disclosed any of these documents to the defense, there is not a reasonable probability that the disclosure would have altered the outcome of the trial. The two documents related to the Tina Smith murder and the four documents related to the robbery of the Antonovich Furs store in Brooklyn have no relevance to the jury's verdict against petitioner because petitioner was not charged with these crimes. The identification in document nine of two black males near the scene of the Jindo Furs robbery is not exculpatory, nor does it serve to impeach any of the trial testimony. The report merely states that a witness saw two black males around the scene of the crime, and in fact states that the witness does not believe that the two black males he saw were involved in the robbery. The statements in documents nine and ten, that the Jindo Furs robbers were masked and armed, are also not exculpatory. Petitioner argues that these statements contradict government informant Schrader's testimony. However, Schrader's testimony was about another robbery at Jindo Furs that occurred in 1986, not the October 1989 robbery that the police reports describe. Document eleven

is also not exculpatory.  Although petitioner may not match the description of the balding car thief identified by the witness, the witness also stated that two other men were involved in the theft.  The witness' brief description of the other two car thieves does not rule out the possibility that petitioner was one of the three men.  Finally, the report contained in document twelve that a witness saw a lone man, who did not match petitioner's description, looking into the A Certain Image fur store on three separate evenings leading up to the robbery, does not contradict any of the trial testimony, nor exculpate the petitioner.

The statements in documents three and four, phone call transcripts regarding the Dyansen gallery and Cassandra Designs robberies that petitioner alleges were released by the FBI on September 28, 2001, seem potentially exculpatory on their face.  However, there is no reasonable probability that the result at trial would have been different if these transcripts had been disclosed.  First, the second call on the 911 call transcript about the Dyansen robbery, in which the caller identifies three black males as the robbers, matches the description of the fake 911 call made by Charles Schrader.  Charles Schrader testified at trial that he made a fake 911 call about the Dyansen Art Gallery robbery in which he told the 911 dispatcher that he chased the robbers

over the Manhattan Bridge and that the robbers then drove onto the Brooklyn-Queens Expressway (the "BQE").  Schrader noted that the robbers had in fact traveled in the opposite direction off the bridge.  The second caller on the 911 transcript tells this same story about chasing the robbers over the bridge and losing them on the BQE.  In light of Schrader's testimony about the fake 911 call he made, the availability of the transcript of this call would not have served to exculpate petitioner.

In addition, there is no reasonable probability that the availability of the transcript of the first 911 call about the Dyansen robbery, in which the caller identified the robbers as three or four black and white men, would have resulted in a different result at trial.  The caller on the 911 transcript provided very little information about the robbery suspects, except to note the approximate number and that they were black and white men.  The caller also refused to provide his telephone number to the dispatcher and may also have refused to provide his name.[4]  In contrast, the evidence of petitioner's involvement in the Dyansen gallery robbery was strong.  To prove petitioner's involvement in

---

[4] The 911 transcript submitted by petitioner is redacted so that the line where the caller might have stated his name is blacked out.  The line where the caller might have stated his phone number is also blacked out, but it is clear from the redacted copy that the response to the request for the caller's phone number is too brief to contain an entire phone number.

the Dyansen robbery, the government presented the eyewitness testimony of Paul Vidich and Sheldon Seidler, who both lived above the gallery.  Vidich testified that on the night of the robbery he heard a loud crashing sound and then observed a white male talking on a walkie-talkie or cell phone standing near a mid-sized American car that was parked near the gallery.  Seidler testified that on the night of the robbery he also heard a loud noise and then observed a man talking on what appeared to be a walkie-talkie in the middle of the street near the gallery, nervously looking in various directions.  The man later got into a car with an open trunk and drove away.  This testimony corroborated the testimony of Charles Schrader, who testified that he participated in the robbery with petitioner.  The government also presented the testimony of Eleni Michailidis, who identified petitioner and codefendant Rene Tellier as the men who rented the garage from which the artwork stolen from the Dyansen gallery was recovered.  There is therefore no reasonable probability that the availability of this 911 call transcript about the Dyansen robbery could have resulted in a different verdict at trial.

As for the 911 transcript related to the Cassandra Designs robbery, the Cassandra Designs robbery was just one of more than a dozen predicate acts set forth in the

racketeering charge in the indictment.  The errors alleged
by petitioner here and elsewhere in his motion to vacate his
conviction do not affect the jury's findings that petitioner
committed the two predicate acts of robbery near a Pearle
Express store in Yonkers and interstate transport of furs
stolen from John Pappas Furs.  Therefore, even if the
government's alleged failure to disclose the 911 transcript
might have altered the jury's finding that petitioner
committed the robbery, this finding would not have altered
the verdict against petitioner on the racketeering charges.

IV. Proof of Substantial Effect on Interstate Commerce for
Hobbs Act Conviction

Petitioner finally argues that his convictions for
conspiracy to obstruct commerce by robbery and his
conviction for the use and carrying of a firearm in that
robbery, both based on petitioner's involvement in the
robbery of a private home in Wayne, N.J., must be vacated.
Petitioner argues that the New Jersey robbery was a robbery
of a private individual and did not deplete the assets of an
entity engaged in interstate business.

First, petitioner fails to show cause for not raising
this claim on direct appeal.  Furthermore, petitioner's
claim is without merit.  The required nexus to interstate
commerce to prove a violation of 18 U.S.C. § 1951(a) is de

minimis.  See United States v. Farrish, 122 F.3d 146, 148
(2d Cir. 1997)(holding that United States v. Lopez, 514 U.S.
549 (1995), did not alter the long-standing rule that the
government need only demonstrate a de minimis effect upon
commerce in order to establish jurisdiction).  The
government did establish a de minimis link to interstate
commerce by showing that petitioner transported the stolen
property from the robbery in New Jersey to New York in order
to sell it.

V. Discovery Request

Petitioner requests discovery in this case in order to
investigate fully his claims of government misconduct.
Petitioner has failed to show good cause for allowing him to
obtain the discovery he seeks.


CONCLUSION

For the foregoing reasons, petitioner's request to
conduct discovery, request to possess transcripts, and
motion to vacate his conviction are denied.


Dated:    New York, New York
          July 31, 2006

                         S/_____
                            MIRIAM GOLDMAN CEDARBAUM
                            United States District Judge